UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JERMAINE MCADORY,

        Plaintiff,

    v.                                Case No. 14-C-0942

ROBERT FRANK, et al.,

        Defendants.

ORDER DENYING PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT
AND GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Jermaine McAdory, a Wisconsin state prisoner who is representing himself, filed this civil rights action pursuant to 42 U.S.C. § 1983. The court screened McAdory's complaint in accordance with 28 U.S.C § 1915A(a) and allowed him to proceed with his claims that: 1) defendants Craig Schoenecker and Robert Frank violated the Eighth Amendment when they failed to address his concerns about side effects from the prescribed drug Trazodone; 2) defendants Schoenecker, Frank, Charles Larson, and Wendy Polenska violated the Eighth Amendment when they failed to address his concerns about side effects from the prescribed drug Meloxicam; and 3) defendants Schoenecker, Frank, Larson, and Polenska violated state law when they committed medical malpractice. This case is now before the court on cross-motions for summary judgment. (Docs. 32, 52, 71.)

I.    RELEVANT FACTS

The facts in this section are taken primarily from "Defendants' Proposed Findings of Fact" (Doc. 34); those facts are accepted as true for purposes of this decision because plaintiff failed to respond to them. *See* Civil Local Rule 56(a)(1)(A) (E.D. Wis.). Additional

facts are derived from plaintiff's sworn complaint, which the Seventh Circuit has instructed district courts to construe as an affidavit at the summary judgment stage. *Ford v. Wilson*, 90 F.3d 245, 246-47 (7th Cir. 1996).

On March 29, 2016, more than five months after the dispositive motion deadline and more than two months after plaintiff filed the latter of his two motions for summary judgment, plaintiff filed proposed findings of fact. Defendants have moved to strike this filing as untimely and because it fails to comply with Civil Local Rule 56(b)(1)(C). However, the court does not favor striking filings from the record; yet, for the reasons stated in defendants' motion, the court will not consider plaintiff's proposed findings of fact in evaluating the pending summary judgment motions.

Plaintiff was housed at Fox Lake Correctional Institution (Fox Lake) from April 15, 2014 to April 16, 2015. (Doc. 34 ¶ 1.) During that time, Schoenecker, who is employed part-time by the Wisconsin Department of Corrections (DOC) as a psychiatrist, worked at Fox Lake providing psychiatric services to inmates. (*Id*. ¶¶ 3-4.) Larson is employed by the DOC as a physician and works at Fox Lake providing medical services to inmates. (*Id*. ¶ 5-6.) Polenska is employed by the DOC as a Nurse Clinician II in the Health Services Unit (HSU) at Fox Lake, and Frank is employed by the DOC as a nurse practitioner at Fox Lake. (*Id*. ¶¶ 7-8.)

On September 27, 2013, while housed at Columbia Correctional Institution, plaintiff was prescribed Trazodone, an antidepressant medication, to treat his insomnia and to help improve his mood. (*Id*. ¶¶ 23-24.) Trazodone has the potential to cause side effects, including allergic reaction, anxiety, confusion, weakness, fast heartrate, irritableness,

trouble sleeping, light-headedness, dizziness, prolonged erection, unusual behavior, thoughts of hurting yourself, unusual bleeding or bruising, blurred vision, constipation, dry mouth, headaches and sleepiness. (*Id*. ¶ 25.) Schoenecker states that the side-effects he considers most serious are prolonged erection, suicidal thoughts, and confusion. (*Id*. ¶ 26.) He would expect to see patients with those side effects as soon as possible. (*Id*.) However, less serious side effects, including nasal congestion, over-sedation, headache, nightmares, nausea, and irritability, would be discussed with patients, but not on an emergency basis. (*Id*. ¶ 25.)

Schoenecker explains that side effects of any medication will almost always occur in the first week of exposure to a new medication and will sometimes resolve if the patient stays on the medication long enough. (*Id*. ¶ 28.) If someone has taken something for more than a month and then suddenly experiences what they believe to be a side effect, Schoenecker questions whether the side effect is due to the medication. (*Id*.)

According to Schoenecker, nightmares are a common side effect of Trazodone, but are not serious. (*Id*. ¶ 29.) If nightmares were caused by Trazodone, they would occur in the first week, and it would be unusual for them to occur as a new side effect after a patient being on the medication for seven months, even if the dosage were increased. (*Id*.)

Between September 2013 and April 2014, plaintiff was taking Trazodone with no complaints of side effects. (*Id*. ¶ 30.) His dosage was increased on February 21, 2014, and April 11, 2014, by Dr. Robert Vickrey at the plaintiff's request to help him improve his sleep. (*Id*. ¶¶ 31-33.)

3

Plaintiff was transferred to Fox Lake on April 15, 2014. (*Id*. ¶ 34.) Five days after his transfer and nine days after his appointment with Dr. Vickrey, plaintiff submitted a Psychological Service Request (Request Form) stating:

> To whom this may concern, this Trazodone is causing me to have headaches that is unbearable on my left side of my head, Im having nightmares to the point I actually act out physically in my sleep and it is not helping me to sleep. The doctor at CCI told me to let him know if the Trazodone is not working and he will put me on a diverse medication, but I end up moving here. Can I see you soon please.

(*Id*. ¶ 35.)

Request Forms are typically received and triaged by nursing staff, who, if necessary, forward them to Schoenecker. (*Id*. ¶ 36.) Plaintiff's Request Form was triaged by HSU staff on April 21, 2014, and he was scheduled him for an appointment with Schoenecker on May 14, 2014. (*Id*. ¶ 41.) Scheduling is done at the discretion of the nursing staff, who designate inmates to see a medical provider based on the provider's schedule and the priority of an inmate's condition. (*Id*. ¶¶ 38-39.) If nursing staff feel an inmate's concerns are emergent, Schoenecker can see them the same day or within a few days. (*Id*. ¶ 39.) Plaintiff was scheduled for May 14, 2014. Schoenecker speculates this was the first opening in his schedule based on the priority of other appointments. (*Id*. ¶ 41.) (Schoenecker does not clarify whether he also receives/reviews Request Forms submitted by inmates, whether he was aware of plaintiff's Request Form prior to the scheduled appointment on May 14, or whether he always defers to the scheduling nurse's prioritization of Request Forms.)

On May 3, 2014, plaintiff reported that he fell from his top bunk. (*Id*. ¶ 58.) Plaintiff states that he fell while having a nightmare and landed on his back, hitting the back of his

head. (Doc. 1 at 3.) That day, he was given a medical restriction allowing him to apply ice six times per day until July 3, 2014. (Doc. 34 ¶ 58.) On May 4, 2014, nursing staff saw plaintiff, gave him ibuprofen, analgesic balm, along with ice, and ordered him to rest. (*Id*.)

Plaintiff had a follow-up appointment with Frank on May 8, 2014. (*Id*. ¶ 57.) Plaintiff told Frank that he had been having frequent nightmares, which he thought were due to the increased dosage of Trazodone. (*Id*. ¶ 60.) He reported that he fell from his bunk on May 3, 2014, and had fallen on his back; he complained of lower back pain and neck pain. (*Id*.) However, he noted that he did not lose consciousness from the fall, and further advised Frank that he had been using the ibuprofen and balm with some relief. (*Id*.)

Frank examined plaintiff and diagnosed him with a lumbar sacral strain and neck strain. (*Id*. ¶ 62.) Frank found that plaintiff did not exhibit any symptoms of fracture or broken bone and decided not to order an x-ray or CT scan. (*Id*. ¶ 65.) Muscle strains are not detectable by x-ray. (*Id*. ¶ 66.) Frank told plaintiff to continue with the balm, and ordered a low-bunk restriction for six months so plaintiff could get his psychiatric medications regulated. (*Id*. ¶ 67.) Moreover, Frank discontinued the ibuprofen and prescribed Meloxicam for three months, as needed, for the pain. (*Id*. ¶ 68.) Additionally, Frank placed the order for Meloxicam on May 8, 2014, and plaintiff received it on May 13, 2014. (*Id*. ¶ 75.)

Meloxicam is a non-steroidal, anti-inflammatory drug (NSAID) used to reduce pain, swelling and stiffness of the joints. (*Id*. ¶ 69.) A patient must take the medication as ordered for up to two weeks before the full benefit of the drug may be achieved. (*Id*.) Developing an allergic reaction from this medication is extremely rare. (*Id*.) Frank chose

5

Meloxicam because it is generally well-tolerated and an effective pain reliever with minimal side effects. (*Id*.) In addition, plaintiff had taken medications, such as ibuprofen, that are very similar to Meloxicam without problems. (*Id*. ¶¶ 72, 74.) Frank believes that, regardless of the type of medication, there is always potential for side effects. (*Id*. ¶ 70.) In his view, most side effects are temporary and subside within a few days of a patient stopping the medication. (*Id*. ¶¶ 71, 83, 87.)

On May 14, 2014, Schoenecker saw plaintiff for a psychiatric follow-up. (*Id*. ¶ 46.) During the appointment, plaintiff told Schoenecker that he would like to discontinue the Trazodone because he felt like it was causing persistent headaches, nightmares, and grogginess. (*Id*.) Schoenecker discontinued the Trazodone and discussed with plaintiff alternative medication. (*Id*. ¶¶ 46, 52) According to Schoenecker, during the appointment, plaintiff did not tell him that he had fallen from his top bunk, though plaintiff did mention that his back hurt. Indeed, Schoenecker didn't even know plaintiff was assigned to a top bunk. (*Id*. ¶¶ 42, 55.)

On May 15, 2014, Larson had his first appointment with plaintiff to follow-up on his complaints of spine and head pain after falling from his top-bunk due to a nightmare induced by his psychiatric medication. (*Id*. ¶ 79.) Plaintiff complained of chest discomfort and black stools since starting the Meloxicam prescribed by Frank. (*Id*. ¶ 81.) Larson told plaintiff to continue with the balm, discontinued the Meloxicam and told plaintiff to avoid NSAID medications; he found no basis to keep plaintiff on other oral analgesic medications. (*Id*. ¶ 87.) Larson agreed with Frank's assessment that there were no

6

objective findings on which to base additional x-ray evaluations.  (*Id*. ¶ 88.)  Plaintiff did not complain of a rash.  (*Id*. ¶ 81.)

On May 16, 2014, Polenska received a telephone call from a unit sergeant reporting that plaintiff thought he was having a stroke.  (*Id*. ¶ 90.)  The sergeant called plaintiff to the desk and asked for his symptoms.  (*Id*. ¶ 91.)  Polenska heard plaintiff say "head pain and face twisting."  (*Id*.)  Polenska asked the sergeant whether plaintiff was exhibiting symptoms such as one-sided facial drooping, garbled speech, or walking heavy footed or with an unsteady gait, which are possible signs of a stroke. (*Id*.)  The sergeant denied plaintiff was exhibiting any of those symptoms.  (*Id*.)  Polenska determined that plaintiff's symptoms did not match the symptoms of a stroke or warrant an emergency visit, so she asked the sergeant to have plaintiff complete a Health Services request form (HSR).  (*Id*. ¶ 94.)  This was Polenska's only interaction with plaintiff.  (*Id*. ¶ 96.)

The next day, on May 17, 2014, plaintiff was seen by a registered nurse to follow up on plaintiff's HSR.  (*Id*. ¶ 98.)  Plaintiff complained of sharp pain in his head but did not mention any other symptoms.  (*Id*.)  The nurse assessed plaintiff and found no apparent abnormalities.  (*Id*.)

On June 26, 2014, plaintiff had an appointment with a nurse regarding his concern about a rash.  (*Id*. ¶ 106.)  The nurse prescribed him some hydrocortisone cream.  (*Id*.)  On July 1, 2014, plaintiff had an appointment with Larson, at which time he complained that since stopping the Meloxicam, he had developed a rash that occurred most often when he sweat.  (*Id*. ¶ 107.)  Larson advised plaintiff to avoid NSAIDs and he educated plaintiff on self-care and prevention of heat rash, emphasizing cool compresses.  (*Id*.

7

¶ 109.)  Larson also recommended Calamine lotion for itchiness and to continue hydrocortisone cream twice daily, as needed, for inflammation.  (*Id*. ¶ 110.)

On July 22, 2014, Larson saw plaintiff again.  (*Id*. ¶ 112.)  Plaintiff requested cream and Benadryl for his dry skin and itch.  (*Id*.)  However, Larson ordered Diphenhydramine for itch as needed, in addition to a jar of Minerin Cream that plaintiff requested.  (*Id*. ¶ 114.)

## II.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011).  "Material facts" are those that "might affect the outcome of the suit."  *See Anderson*, 477 U.S. at 248.  A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:  "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that

would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

III.    ANALYSIS

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when their conduct demonstrates 'deliberate indifference to serious medical needs of prisoners.'" *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997). This standard contains an objective element (i.e., that the medical need be sufficiently serious) and a subjective element (i.e., that the officials act with a sufficiently culpable state of mind). *Id.*

To qualify as a "serious" medical condition under the objective prong, the condition must be "one that a physician has diagnosed as needing treatment or that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009).

Establishing deliberate indifference under the subjective prong is a high standard; medical malpractice is insufficient, as is a mere disagreement with a medical professional's medical judgment. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011). "A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, 'no minimally competent professional would have so responded under those circumstances.'" *Arnett*, 658 F.3d at 751 (*quoting Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)).

9

In addition, the Court of Appeals for the Seventh Circuit has confirmed repeatedly that a delay in treatment, even when it does not exacerbate injuries, can be a basis for an Eighth Amendment claim. *See Smith v. Knox County Jail*, 666 F.3d 1037, 1039-40 (7th Cir. 2012); *Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011). "The length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Smith*, 666 F.3d at 1040 (*quoting McGowan v. Hulick,* 612 F.3d 636, 640 (7th Cir. 2010)).

> Medical 'need' runs the gamut from a need for an immediate intervention to save the patient's life to the desire for medical treatment of trivial discomforts and cosmetic imperfections that most people ignore. At the top of the range a deliberate refusal to treat is an obvious violation of the Eighth Amendment, and at the bottom of the range a deliberate refusal to treat is obviously not a violation. Where to draw the line between the end points is a question of judgment that does not lend itself to mechanical resolution. It is a matter of determining the civilized minimum of public concern for the health of prisoners, which depends on the particular circumstances of the individual prisoner. Beyond this it is difficult to generalize, except to observe that the civilized minimum is a function both of objective need and cost. The lower the cost, the less need has to be shown, but the need must still be shown to be substantial.

*Ralston v. McGovern*, 167 F.3d 1160, 1161-62 (7th Cir. 1999) (internal citations omitted).

A.    Dr. Craig Schoenecker

Plaintiff claims that Schoenecker demonstrated deliberate indifference to his serious medical needs by failing to change his top-bunk assignment and waiting more than three weeks before discontinuing his Trazodone prescription despite complaints of headaches and nightmares. Schoenecker argues that summary judgment should be granted in his favor because (1) he did not know that plaintiff was assigned to a top bunk; (2) plaintiff's

10

complaints of headaches and nightmares were not objectively serious; and (3) he was not deliberately indifferent to plaintiff's medical needs.

1.    The Bunk Assignment

It is well established that for a defendant to be held liable under § 1983, a plaintiff must show that the defendant had "actual knowledge" that he was "at risk of serious harm." *Pittman ex rel. Hamilton v. County of Madison, Ill.,* 746 F.3d 766, 778 (7th Cir. 2014) (emphasis in original); *Belbachir v. County of McHenry*, 726 F.3d 975, 982 (7th Cir. 2013) (affirming dismissal of nurse because she had no knowledge that prisoner was suicidal). The court need not analyze whether Schoenecker was deliberately indifferent to the risk of plaintiff falling from his top bunk because the undisputed facts show that Schoenecker was not aware of plaintiff's top-bunk assignment.

Plaintiff argues that he is sure that a nurse sent Schoenecker an email regarding the bunk assignment, and that Schoenecker must have known based on plaintiff's assigned bunk number.   However, plaintiff provides no evidence to support these arguments–he does not attach the nurse's email, he does not include an affidavit from the nurse, nor does he demonstrate that Schoenecker had access to his bunk number, or that he understood the significance of such a number.

On the other hand, Schoenecker states that he had no idea plaintiff was assigned to the top bunk.  He notes that plaintiff's Request Form complained only of headaches, nightmares, and trouble sleeping, and adds that he did not receive any emails about plaintiff or his bunk assignment in May 2014.

Plaintiff cannot create a dispute of material fact (i.e., whether Schoenecker knew about the bunk assignment) by arguing unsupported conclusions and assumptions.

11

Plaintiff has set forth no evidence disputing Schoenecker's statement that he did not know about plaintiff's bunk assignment, and without this knowledge Schoenecker could not have addressed whatever risk such an assignment posed. Shoenecker is entitled to summary judgment on this aspect of plaintiff's claim.

2.      Discontinuing Trazodone

For plaintiff to succeed on his deliberate indifference claim, he must establish (1) that the headaches and nightmares he was suffering were objectively serious, and (2) that Schoenecker was deliberately indifferent to those symptoms when he waited twenty-four days before seeing plaintiff.

Plaintiff maintains that as a result of taking Trazodone, he suffered "headaches that [were] unbearable on [the] left side of [his] head" and "nightmares to the point [that he] actually act[ed] out physically in [his] sleep." (Doc. 1-1 at 5.) He submits that Trazodone was not helping him sleep, although his inability to sleep was part of the reason Trazodone was initially prescribed.

"An objectively serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir.2012) (*quoting Zentmyer v. Kendall County*, 220 F.3d 805, 810 (7th Cir.2000)). However, failure to treat minor conditions such as sniffles, minor aches, pains, tiny scratches or mild headaches-the type of ailments for which people outside of prison often do not seek medical attention-do not violate the Constitution. *Rodriguez v. Plymouth Ambulance Serv.,* 577 F.3d 816, 829 (7th Cir.2009) (citations omitted). Severe headaches

12

on their own (plaintiff's headaches were accompanied by nightmares and an inability to sleep) may be sufficient to satisfy the objectively serious medical condition requirement. See, e.g., *Edens v. Larson*, 110 Fed. Appx. 710, 714 (7th Cir. 2004) (unpublished). Moreover, exposure to prolonged and unnecessary pain, even for a few days, may constitute deliberate indifference. *Smith v. Knox County Jail*, 666 F.3d 1037, 1040 (7th Cir.2012) (per curiam) (citations omitted). Here, plaintiff is a competent witness to testify as to the severity of his pain, and he maintains that his pain was significant and lasted multiple weeks. This is sufficient to establish a genuine issue of material fact as to whether plaintiff had an objectively serious medical condition.

Schoenecker argues that, even if the headaches and nightmares can be found to be objectively serious, he was not deliberately indifferent to plaintiff's condition because he discontinued the Trazodone prescription at the time of his first appointment and that plaintiff's condition did not worsen during the twenty-four days between plaintiff's complaint and the appointment. Additionally, Schoenecker asserts that the record shows that plaintiff "likely" would have had the nightmares regardless of whether he was taking the Trazodone. (Doc. 33 at 15.)

Regardless, the Court of Appeals for the Seventh Circuit has concluded that prolonged suffering, on its own (without a worsening of one's condition), may be sufficient to constitute harm. *See Williams v. Liefer*, 491 F.3d 710, 716 (7th Cir. 2007) (affirming denial of summary judgment when delay caused plaintiff six extra hours of pain and dangerously elevated blood pressure for no good reason); *Smith*, 666 F.3d at 1040

13

("deliberate indifference to prolonged, unnecessary pain can itself be the basis for an Eighth Amendment claim").

Here, plaintiff complains that he experienced uncomfortable side-effects from a prescribed drug; side effects that Schoenecker eventually treated quite easily by discontinuing plaintiff's prescription. Although plaintiff's condition may not have warranted immediate attention, a material question of fact exists as to whether Schoenecker violated the Eighth Amendment when he delayed addressing plaintiff's headaches and nightmares for twenty-four days. In these circumstances, where the symptoms suffered by plaintiff were painful and the treatment (discontinuing the medication) was easy, a jury could conclude that the delay in treatment constituted deliberate indifference.

Notably, Schoenecker further argues that there is evidence in the record indicating that plaintiff's symptoms were likely caused by prescriptions other than Trazodone. If that were the case, plaintiff's symptoms would have occurred regardless of when Schoenecker discontinued the Trazodone. But, whether the side effects were caused by Trazodone or another medication is a question of fact that the court cannot resolve on summary judgment.

3.    Qualified Immunity

Despite his claims concerning plaintiff's treatment, at the time of his initial appointment Schoenecker is not entitled to qualified immunity. "The purpose of the doctrine of qualified immunity is to shield public officers from liability 'consequent upon either a change in law after they acted or enduring legal uncertainty that makes it difficult for the officer to assess the lawfulness of the act in question before he does it.'" *Walker v. Benjamin*, 293 F.3d 1030, 1040-41 (7th Cir. 2002) (quoting *Ralston v. McGovern*, 167

14

F.3d 1160, 1162 (7th Cir. 1999)). The general standard for liability under the Eighth Amendment for refusing and/or delaying treatment for a serious medical condition was well established at the time of these events.

B. Nurse Robert Frank

Plaintiff complains that Frank violated the Eighth Amendment because (1) he knew that plaintiff was in danger based on his top-bunk assignment, yet he delayed giving plaintiff a temporary lower-bunk assignment for five days; (2) he gave plaintiff a temporary low-bunk assignment instead of a permanent one; and (3) he prescribed a dangerous pain reliever without performing a CT scan and/or x-ray.

1. The Bunk Assignment

On May 3, 2014, after plaintiff fell from his top-bunk and a nurse gave him a medical restriction that allowed him to apply ice six times per day, as needed for two months. The following day, the nursing staff gave plaintiff ibuprofen and analgesic balm. Plaintiff was then scheduled to see Nurse Frank on May 8, 2014. This was plaintiff's first appointment with Frank who says he has no prior knowledge that plaintiff had requested a low-bunk assignment. However, plaintiff maintains that another nurse sent Frank an email on that topic, whereas Frank states that he did not receive such an email. Regardless, plaintiff has not supported this claim with admissible evidence ,such as the email or an affidavit from the nurse who allegedly sent the email. Hence, there is no proof that Frank knew plaintiff wanted to be transferred to a bottom bunk, or a material question of fact about whether Frank knew of any danger related to plaintiff's top bunk assignment.

Further, even if Frank had known about plaintiff's desire to be reassigned to a bottom bunk, he would not have violated the Eighth Amendment by delaying plaintiff's

15

reassignment by less than a week. Assignment of a prisoner to a top bunk, even one without rails, is not an objectively serious condition of confinement. The fact that plaintiff fell from his bunk one time does not change this analysis. In addition, even if bunk assignments were an objectively serious condition of confinement, Frank addressed that condition on his first interaction with plaintiff and his delay in doing so did not prolong plaintiff's pain or cause any other detriment to plaintiff who did not fall from his bunk during the period between his request and reassignment to a bottom bunk.

Finally, that Frank did not reassign plaintiff to a lower-bunk permanently does not establish deliberate indifference. After being told by plaintiff that he had fallen from his top bunk, Frank moved plaintiff to a lower bunk temporarily to give plaintiff adequate time to sort out his medication. Plaintiff stopped taking the Trazodone shortly thereafter, thereby eliminating his stated need for a lower-bunk assignment. Hence, Frank provided plaintiff with exactly what he needed—a bottom bunk—while he was having nightmares.

2.    Treating the Injuries from the Fall

Frank concedes for purposes of summary judgment that plaintiff's injuries from falling from his top bunk could satisfy the objective seriousness requirement; nevertheless, he argues that plaintiff's claim against him fails because he is unable to show that he was deliberately indifferent to injuries. The court agrees.

The day plaintiff fell from his top bunk, he was evaluated and allowed ice for the swelling up to six times per day. The next day, he was evaluated again and given medication for pain, balm for his sore muscles and scheduled to see Frank at the earliest possible appointment. Based on Frank's schedule, the appointment was calendared a few days later. While plaintiff waited for his appointment, he received treatment for his injuries

16

(e.g., ibuprofen, analgesic balm, and ice), that addressed his complaints of pain. The brief delay between plaintiff's fall and his appointment with Frank did not exacerbate any injuries, nor did it prolong unnecessary pain. As a consequence, the delay in the appointment is not actionable.

Frank's decision not to order tests such as an x-ray or CT scan does not amount to deliberate indifference because mere disagreement with a course of treatment is insufficient to serve as a basis for an Eighth Amendment claim. The Seventh Circuit has said, "a deliberate decision by a doctor to treat a medical need in a particular manner" does not equate to deliberate indifference. *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996). Frank examined plaintiff's neck and back, diagnosed a lumbar sacral strain as well as a neck strain and determined that no further tests were warranted. In the absence of clear evidence that a contrary course should have been taken, such a decision does not run afoul of the Eighth Amendment. While plaintiff argues that Frank should have done an x-ray or CT scan before prescribing Meloxicam, a generally well-tolerated NSAID, he does not explain how such tests would have alerted Frank to allergic reactions that he might suffer. Plaintiff concedes that people react differently to medications, and he provides no evidence that Frank knew he would have a reaction. Simply put, Frank was not deliberately indifferent when he decided to address plaintiff's complaints of pain by not ordering an x-ray or CT scan and prescribing Meloxicam.

C.      Dr. Charles Larson

Plaintiff's claims against Dr. Charles Larson fail for the same reasons his claims against Frank fail. Specifically, plaintiff claims that Larson (1) refused to permanently

assign plaintiff to a bottom bunk; (2) decided not to order an x-ray; and (3) failed to correctly diagnose a rash that he developed after he stopped taking Meloxicam.

As the court explained earlier, mere disagreement with a health provider's decision to treat a plaintiff in a certain way does not equate to deliberate indifference. A medical provider is able to exercise judgment without running afoul of the Constitution. That is the situation here. Larson determined that assigning plaintiff to a bottom-bunk permanently was unnecessary. By the time plaintiff saw Larson on May 15, 2014, his prescription to Trazodone had been discontinued, and the alleged side-effects from that drug were the only reasons plaintiff gave for having to move from a top bunk. Frank had already given plaintiff a bottom bunk assignment for six months, and Larson concluded that was more than enough time for the side-effects of plaintiff's Trazodone to abate. Further, Larson determined after an examination of plaintiff that there were no objective findings necessitating an x-ray or physical therapy. He addressed plaintiff's complaints, and exercised his medical judgment. That is all the Constitution requires.

Finally, with regard to plaintiff's rash, it is doubtful that a minor skin problem that causes mild itching would be sufficient evidence that plaintiff suffered from an objectively serious medical condition. Second, even if plaintiff's rash were an objectively serious medical condition, he did not complain to Larson about it until July 1, 2014. This was more than six weeks after he stopped taking the Meloxicam. At that appointment, Larson instructed plaintiff to use calamine lotion to relieve the itching and noted that plaintiff was already using hydrocortisone cream. On July 22, 2014, plaintiff saw Larson again, and indicated the rash was persisting. At that point, Larson prescribed an antihistamine and Minerin Cream at plaintiff's request. Just a couple of weeks later, plaintiff filed this lawsuit.

This sequence of events demonstrates that Larson attempted to address plaintiff's concerns, and, when the initial treatment proved ineffective, he revised his treatment approach and tried a new way to relieve plaintiff's symptoms. In proceeding as he did, Larson was not deliberately indifferent to plaintiff's medical needs. *See Martinez v. Hedrick,* 36 Fed. Appx. 209, 212 (7th Cir. 2002) ("Even if the staff's diagnosis was wrong, as long as they believed at all times that their diagnosis was consistent with [plaintiff's] symptoms and they were providing appropriate treatment, the staff was not deliberately indifferent.")

D.      Nurse Wendy Polenska

Polenska's involvement with plaintiff was limited to assessing symptoms to triage his condition. She received a call from a sergeant who informed her that plaintiff was complaining of head pain and face twisting; and she asked follow-up questions to assist her in evaluating plaintiff's symptoms. Based on the sergeant's answers, Polenska determined an emergency visit was unnecessary and that plaintiff should submit an HSR to see a nurse. A different nurse evaluated him in person the following day.

Plaintiff's symptoms of an isolated headache with face twisting are not objectively serious. *See Rodriguez*, 577 F.3d at 829. Further, even if such symptoms were objectively serious, Polenska asked follow-up questions to determine whether plaintiff's condition was emergent. After determining that it was not, she informed the sergeant to have plaintiff complete a request to be seen by a nurse. The following day plaintiff was seen. Therefore, Polenska did not ignore or disregard plaintiff's minor symptoms; she prioritized those symptoms based on their severity and the availability of medical staff to address them. The one-day delay between plaintiff's complaints and appointment did not

19

exacerbate symptoms or unnecessarily prolong his suffering, which was mild and largely resolved by the next day.

E.      Medical Malpractice

Wisconsin law defines medical malpractice as the failure of a medical professional to "exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances." *Sawyer v. Midelfort,* 227 Wis.2d 124, 149 (1999); *Schuster v. Altenberg*, 144 Wis.2d 223, 229 (1988). Under Wisconsin law, medical malpractice claims, which are a subset of negligence claims, require expert testimony to establish the standard of care unless the situation is one where the common knowledge of laymen affords a basis for finding negligence. *Carney-Hayes v. NW. Wis. Home Care, Inc*., 2005 WI 118,  37, 284 Wis.2d 56 (citations omitted); *Jeckell v. Burnside*, 2010 WI App 71,  10, 325 Wis.2d 401 (unpublished).

Plaintiff's situation is not one in which the common knowledge of laypersons affords a basis for finding negligence because, generally, laypersons are not knowledgeable about the identification and treatment of medical/psychiatric conditions and/or potential reactions to prescribed medications.  Therefore, it was plaintiff's burden at summary judgment to provide expert testimony establishing the standard of care applicable to each defendant. Plaintiff's failure to do so is fatal to his medical malpractice claims.  *See Lech v. St. Luke's Samaritan Hosp*., 921 F.2d 714, 716 (7th Cir. 1991) (acknowledging that Wisconsin law "requires expert testimony to establish the standard of care for a physician in a medical malpractice case.")

The court acknowledges that plaintiff has asked for the appointment of a medical expert pursuant to Fed. R. Evid. 706. It is possible that appointing an expert may enable plaintiff to satisfy his burden with regard to establishing the standard of care applicable to each defendant. It is also possible that appointing an expert may assist plaintiff in establishing his deliberate indifference claim against Schoenecker. However, the mere fact that a prisoner needs specific medical evidence to prevail on his claims does not require that a court exercise its authority under Rule 706. If that were the case, courts would be required to appoint experts in nearly all medical cases involving inmates (with most, if not all, of the related costs being billed to the State of Wisconsin).

Rule 706 exists for the court's and/or jury's benefit, not for a party's benefit. An appointed expert is to assist the court or jury in assessing evidence that is unclear, contradictory, or complex. Here, plaintiff's surviving claim is straightforward: He experienced headaches and nightmares after increasing his dosage of Trazodone, and despite his complaints to Schoenecker, he had to endure those symptoms for more than three weeks before Schoenecker discontinued the medication. Schoenecker's defense against plaintiff's claim is also straightforward: He argues that plaintiff's symptoms may not have even been caused by Trazodone, and, even if they were, a delay of three weeks was not too long for plaintiff to wait to be seen given the demands on Schoenecker's schedule and the nature of plaintiff's complaints. With instructions from the court on the applicable law, the court is confident that a jury, without the assistance of an expert, will have no problem determining whether the delay in Schoenecker's treatment constituted deliberate indifference.

IV.    CONCLUSION

IT IS ORDERED that plaintiff's motions for partial summary judgment (Docs. 52, 71) are DENIED.

IT IS FURTHER ORDERED that defendants' motion to strike plaintiff's proposed findings of fact (Doc. 77) is DENIED.

IT IS FURTHER ORDERED that defendants' motion for summary judgment (Doc. 32) is GRANTED as to plaintiff's claims against Robert Frank, Charles Larson, and Wendy Polenska , GRANTED as to his medical malpractice claim against Craig Schoenecker, and DENIED as to his Eighth Amendment claim against Schoenecker as set forth in the body of this decision.

IT IS FURTHER ORDERED that the court will recruit counsel to represent plaintiff on his surviving claim.

Dated at Milwaukee, Wisconsin, this 26th day of April, 2016.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE